HURLBETT & FAUCHER
John D. Faucher, CSB # 232050
3324 State Street, Suite O
Santa Barbara, CA 93105
(805) 963-9111
Facsimile: (805) 367-4154
john@hurlbettfaucher.com

Attorneys for Plaintiff William Hablinski Architecture,
a California Partnership

# IN THE UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SAN FERNANDO VALLEY DIVISION

| | |
|---|---|
| In re | ) CASE NO. 1:08-BK-20205-MT |
| | ) *(CHAPTER 13)* |
| MEHRAN SHAHVERDI, | ) |
| | ) **Complaint For Tortious Interference With** |
| Debtor. | ) **Contract, Conversion, Trespass To Chattel,** |
| | ) **Breach Of Contract, Breach Of The** |
| ———————————————— | ) **Covenant Of Good Faith And Fair Dealing,** |
| WILLIAM HABLINSKI ARCHITECTURE, a | ) **Unjust Enrichment, Promissory Estoppel,** |
| California Partnership, | ) **Misappropriation Of Trade Secrets (By** |
| | ) **Employee),  Unfair Competition (Cal.** |
| Plaintiff, | ) **Business And Professions Code   § 17200),** |
| | ) **Common Law Unfair Competition** |
| vs. | ) **(Palming Off), Breach Of Confidential** |
| | ) **Relationship, False Promise (Fraud),** |
| MEHRAN SHAHVERDI, | ) **Negligent Misrepresentation,** |
| | ) **Breach Of Duty Of Loyalty. And To** |
| Defendant. | ) **Determine Dischargeability Under 11** |
| | ) **U.S.C. § 523(A)** |
| | ) |
| | ) 11 U.S.C. Sec. 523(a)(2), (a)(4) |
| | ) |
| | ) Date:   TO BE SET |
| | ) Time:  TO BE SET |
| | ) Place:  21041 Burbank Blvd., Woodland |
| | ) Hills, CA 91367; Courtroom 302 |
| ———————————————— | ) Judge:  Maureen A. Tighe |

Plaintiff William Hablinski Architecture, a California partnership (WHA), hereby alleges as follows:

<u>PARTIES AND PROCEEDINGS</u>

1.      Plaintiff is a California Limited Partnership and was at all relevant times duly organized and doing business under the laws of the State of California.

2.      Defendant and Debtor, Mehran Shahverdi, is an individual and resident of the City of Los Angeles, County of Los Angeles, California.

3.      The Debtor voluntarily commenced this Chapter 13 case (the "Bankruptcy Case") on December 16, 2008.  Elizabeth Rojas is the duly appointed chapter 13 trustee (the "Trustee").

4.      The deadline for objecting to the Debtor's discharge was scheduled by the Court for March 30, 2009.  The parties stipulated to an extension of that date until April 16, 2009.

<u>JURISDICTION AND VENUE</u>

5.      The Court has jurisdiction over this complaint pursuant to 28 U.S.C. Section 1334(b), the Order of the Chief Judge of the United States District Court for the Central District of California dated July 23, 1984, and General Order No. 266 of the United States District Court for the Central District of California, dated October 9, 1984.

6.      Venue for this proceeding lies in this Court pursuant to 28 U.S.C. Section 1409(a).

7.      The first 14 causes of action herein are non-core matters.  The 15th and 16th causes of action are core proceedings pursuant to 28 U.S.C. Section 157(b)(2)(J).

## STATEMENT OF FACTS

### William Hablinski, Architect

8.      William Hablinski is an acclaimed architect who specializes in the creation of exclusive luxury residences across the United States and around the world.  Hablinski has been practicing architecture for more than 20 years and is the senior partner of William Hablinski Architecture.

9.      WHA provides complete architectural services, from pre-design and program analysis through construction administration and final project inspection.  WHA coordinates the architectural work with that of the entire project team, including the client and the client's representatives, landscape architect, interior designer, general contractor, and consulting engineers.  WHA is thoroughly involved in all aspects of each project team.  The firm has a staff of 25 and offices in Beverly Hills, California; and Austin, Texas.  Hablinski is licensed in Hawaii, Colorado, Texas, and California; eight employees are licensed in California.

10.      The firm has designed dozens of exclusive, luxury homes for clients, many of which are in the 15,000- to 20,000-square-foot range.  The total cost of these homes is millions of dollars.  WHA's charges for designs and related services generally range from $300,000 to $500,000.

11.      WHA clients include famous actors and television personalities, business people, and other celebrities, most of whom require confidentiality from WHA about their projects.  WHA clients expect that WHA will create for them a one-of-a-kind home based on WHA's unique designs.

### WHA's trade secrets

12.      To preserve its clients' privacy, WHA management regularly informs its employees that they were not to talk to third parties about WHA clients or about the projects on which they were working.

13.     WHA is renowned for its distinctive style, which draws inspiration from traditional forms and historical imagery, educed from extensive travels throughout the United States and Europe.  WHA's designs are "period accurate," although they feature modern interior living areas.  WHA does not copy historical residences.  Instead, it creates works that are historically accurate for the particular architectural style (such as Italian, Spanish Colonial, 18th Century French, or Georgian).  WHA painstakingly developed an extensive library of design elements, enabling the firm to compose innovative designs that built upon its previous experience and knowledge, and giving the firm a competitive edge.  WHA's library of design elements, which is not generally known in the industry, provides WHA with an advantage over its competitors.  This design library is WHA proprietary and confidential information.

14.     The signature style of WHA's elegant designs also reflects the firm's strong relationships with its carefully chosen suppliers of materials such as exotic hardwoods, fancy stone and tiles, and other handcrafted, often custom-designed accessories.  These vendors are well-trained in WHA's requirements for historically accurate materials.  WHA requires many of these vendors to execute nondisclosure agreements in which they agree to preserve the confidentiality of the information that WHA has provided them to facilitate their offering of services and materials to WHA.  The vendors' identity and the information provided to them is WHA proprietary and confidential information.

15.     WHA took, and continues to take, reasonable measures to protect its proprietary and confidential information, such as its client information, the Design Library, and vendor information.  (WHA proprietary and confidential information will be referred to as **WHA Trade Secrets**.)  For example, WHA primary Los Angeles offices are located in a building in which a guard is on duty 24 hours a day.  Any visitors to WHA's offices must check in with the guard.  As a regular practice, the guard logs visitors by name, vehicle

license plate number, and vehicle type.  Non-employees are not permitted to roam about the

company's premises unaccompanied.  All employees, project consultants, and contractors

sign nondisclosure (or confidentiality) agreements with WHA before being permitted access

to WHA Trade Secrets.  They agree not to disclose WHA's Trade Secrets and not to use that

information for any purpose other than their work for WHA.  Additionally, WHA protects its

computers, software, and electronic files by requiring passwords before the computers can be

accessed.

### **Mehran Shahverdi, Job Captain**

16.    In April 2000, Shahverdi applied for a position with WHA.  On May 22, 2000,

WHA confirmed Shahverdi's oral acceptance of employment with WHA as a Job Captain, at

a starting salary of $50,000 per year.  (*See* Ex. A, Employment Offer Letter.)

17.    Shahverdi's responsibilities as a job captain at WHA included design

development in conjunction with project managers and partners; research of traditional

architecture detailing; preparation of construction documents in AutoCAD software; manual

design drafting; and travel sometimes to the job site.  (*See* Ex. A, Employment Offer.)

18.    Before working for WHA, Shahverdi had worked for defendants

EuroConcepts (from 1985 through 1990) and Amir Construction (1997 through 1998).

19.    In addition to working for WHA, Shahverdi also owns MSH Design, which

offers design and planning services for "new high-end residential projects, remodeling

projects, and commercial interior design."  According to MSH Design's website

(www.mshdesign.com, now defunct), Shahverdi founded MSH Design, a sole proprietorship,

in 1986.  ("MSH Design" is not registered as a fictitious business name with the city of Los

Angeles.)  Although Shahverdi advertised on his website that he has "extensive experience in

architecture" and that he attempts to "practice green architecture," Shahverdi is not licensed

to practice architecture in the state of California.

**Employee Handbook**

20.    WHA provided Shahverdi with the WHA Employee Handbook ("**Employee**

**Handbook**") when he began his employment with the firm on May 22, 2000.  Shahverdi

acknowledged in writing that he understood the Handbook and agreed with its terms.  In

September 2002, Shahverdi reaffirmed his agreement to the terms of the Employee

Handbook. (Attached and incorporated by this reference are the following exhibits: Ex. A,

Employment Offer; Ex. B, WHA Employee Handbook; Ex. C May 2000 signature pages;

and Ex. D, September 2002 signature pages).

21.    The Employee Handbook contained various provisions addressing the

confidentiality of WHA work product and information and the use of WHA work product

(including intellectual property), information, and equipment.  The Employee Handbook (Ex.

B) contained the following provisions:

Section 30.  CONFLICTS OF INTEREST AND GIFTS.  Avoid any actual or
potential conflict of interest with Hablinski, including relationships with suppliers,
clients, and all other organizations or individuals doing or seeking to do business with
Hablinski.

Section 31. SECONDARY EMPLOYMENT.  Work on secondary employment
projects, including phone calls, is not permitted at any time in the Hablinski office.
You may be required to resign from secondary employment if it adversely affects
your job performance at Hablinski.

Section 32.  CONFIDENTIALITY.  All employees are required to sign a
Confidentiality Agreement.  All of Hablinski's transactions are completely
confidential.  Do not discuss work outside the office.  If you have any questions
regarding confidentiality or receive a request to divulge confidential information,
contact Richard Manion immediately.

22.    Additionally, Appendix B of the Employee Handbook, "COMPUTER

USE/GENERAL INFORMATION," contained explicit provisions regarding the use of WHA

computers, software copyright information, e-mail, Internet, and transmission of electronic

copies of WHA's "Instruments of Service" or work product to persons outside of the firm.

For example, Appendix B contained provisions that (a) employees were required to obtain

authorization from WHA before providing anyone outside of the firm with an electronic copy of any WHA work, and  (b) an agreement setting forth the limitations or licenses governing the use of WHA work must accompany any transmission of an electronic copy of WHA work to anyone outside the firm.  Appendix B also stated that (a) WHA computers, programs, and data stored on its computers are WHA property to be used in performing work for WHA, and (b) that "all work performed or created on the firm's equipment, programs, or accounts, such as documents, email messages, macros, templates, programs, and commands, are the intellectual property of William Hablinski Architecture."

### Fred Sands Project

23.     In or about1999, Fred Sands, a prominent Southern California businessman, approached WHA to design and assist in the building of a family home in Bel-Air Place, California.

24.     On January 4, 2000, WHA and the Fred Sands family trust entered into an Agreement for Professional Architectural Services ("**WHA/Sands Agreement**").  Pursuant to that agreement, WHA would provide the Fred Sands family trust with professional architectural services in connection with the construction of an exclusive, luxury residence of approximately 14,000 square feet (including garage area) in Bel-Air Place, California **("Fred Sands Residence")**.  (Because of modifications to the original design, the Fred Sands Residence eventually was over 15,000 square feet.)  WHA was to design the residence, to prepare design and construction documents, and to provide information and assistance to the general contractor during construction of the residence.   Sands had to approve WHA's work (including its design of the residence) at each phase of WHA's work.

25.     Both parties to the WHA/Sands Agreement understood that the Fred Sands Residence would be distinctive and designed for the Fred Sands family.

26.     The WHA/Sands Agreement specified that the "drawings, specifications, and

documents prepared by the Architect for this Project are instruments of the Architect's

service for use solely with respect to this project and the *Architect shall be deemed the author*

*of these documents and shall retain all the copyrights thereto.* . . . The Architect's drawings,

specifications and documents shall not be used by the Owner or others on other projects . . .

except by agreement in writing with appropriate compensation to the Architect" (emphasis

added).  (See ¶ 9.2, of Exhibit E, Agreement for Professional Architectural Services, which is

attached and incorporated by this reference.)  The agreement further provided that WHA

"shall have the right to photograph the Project or any parts thereof, for inclusion in the

Architect's portfolio.  *The Architect shall not cause any such photograph or other*

*representation to be published in any media without the Owner's prior written permission*

*and subject to restrictions regarding Owner's privacy.*"  (emphasis added) (Ex. E,

Agreement for Professional Architectural Services, ¶ 9.3.)

27.    To ensure confidentiality on its projects and of its clients, WHA often referred

to its projects by "code names," such as the name of a family trust or code name used by its

client for the project.  WHA identified Fred Sands Residence by the family trust on all WHA

drawings and documents.  And, as was its practice, WHA management regularly reminded its

employees that they were not to discuss with third parties the WHA projects (including the

Fred Sands Residence).

28.    In late 2000, WHA submitted Fred Sands Residence plans to the Los Angeles

Building Department, which issued building permits for the project on March 15, 2001.

Construction on the Fred Sands Residence began in 2001.

### **Shahverdi's involvement with the Fred Sands Residence**

29.    Almost from the start of his employment, one of Shahverdi's assignments was

the Fred Sands Residence.  The information provided to Shahverdi by WHA concerning the

Fred Sands Project was highly confidential and included WHA Trade Secrets and elements

from the Design Library. Shahverdi was never authorized by WHA to utilize, reproduce or

exploit this information, including WHA Trade Secrets and the Design Library, for any

purpose other than for the Fred Sands Residence project. Shahverdi was very familiar with

the project, particularly the architectural drawings. In fact, subject to the limitations set forth

above, Shahverdi worked on the architectural drawings for the Fred Sands Residence.  For

example, the master bathroom was revised several times and Shahverdi was familiar with the

various revisions.  WHA encouraged its employees to visit job sites of the projects on which

they were working.  Thus, on various occasions Shahverdi also visited the job site for the

Fred Sands Residence and took digital photographs of the project as construction progressed.

30.    All documents relating to the Fred Sands Residence were stored in digital

form in numbered files on WHA's master server, which was linked to each workstation.

Employees were required to enter a password to log onto the network.  As an employee

engaged in collaborative design efforts, and subject to his obligations of confidentiality and

non-disclosure described above, Shahverdi was permitted complete access to the project

drawings, specifications, CAD files, and correspondence relating to all current WHA projects

any time he entered the building, accessed his assigned work station, typed in his password,

and logged onto the WHA network.  Subject to his obligations of confidentiality and non-

disclosure described above, WHA permitted Shahverdi to install a copy of Auto-CAD

software on his home computer, so that he could work on WHA projects at home, if

necessary

31.    WHA did not authorize Shahverdi to use any of its drawings, plans, or designs

for his personal use or for use by others.

### Discovery of Copycat House

32.    On April 30, 2003, while on a WHA errand, Dave Hogan and Richard

Giesbret, WHA senior project managers, drove by a construction site at 1076 Marilyn Drive,

Beverly Hills, California.  Hogan noticed a pediment detail in the house under construction

and commented that it was nice detailing job.  Giesbret remarked that the house appeared

well designed.  The two men decided to take a closer look at the project as a matter of

professional curiosity.  As they drove up to the building being constructed at 1076 Marilyn

Drive, they were surprised to see what they knew as the Fred Sands Residence.  The building

being constructed at 1076 Marilyn Drive (the "**Copycat House**") had virtually the same

details on the precast balconies, the entablatures, the rafter tails, and the main entry as the

Fred Sands Residence.  The general massing of the two structures were very similar.

33.    Although the garage on the Copycat House was different from the Fred Sands

Residence, the garage on the Copycat House reminded Hogan of a different WHA project.

The garage on the Copycat House was similar to the other WHA project in the garage door

details, the location relative to the main volume of the residence, the slight bend in the garage

wing, the relative size of the porte cochere, and the windows above the porte cochere.

34.    Hogan and Giesbret went inside the Copycat House and found striking

similarities to the Fred Sands Residence with regard to the floor plan and interior space

(including the layout as to the Living Room, Media Room, Media Room bar, Powder Room,

and Library).  For example, the Dining Room was in the same position as in the Fred Sands

Residence and the Dining Room coved ceiling—like other ceiling designs throughout the

Copycat Residence—was similar or identical to the Fred Sands Residence.  Furthermore, the

Kitchen, Breakfast Room, the Master Suite, and Gym were also very similar to those in the

Fred Sands Residence.  The master bath was actually an alternative design that WHA had

created for Sands, who elected to use the original design.  Other architectural details designed

specifically for the Fred Sands Residence also appear in the Copycat House.

35.    During their tour of the Copycat House, Hogan and Giesbret saw drawings for

the Copycat House, including an interior details sheet.  The sheet size and the details

appeared to be identical to the details for the Fred Sands Residence.  The logo and website address from Shahverdi's business, MSH Design, was on the drawings at the same place where the WHA logo was positioned on WHA drawings.  The two men left the site and immediately reported their discovery of the Copycat House to Hablinski.

36.    While a WHA employee, Shahverdi used a computer, which was owned by WHA and located at WHA offices.  Shahverdi left electronic files (CAD drawings) of the Copycat House exterior elevations, first floor plan, and partial second floor plan on Shahverdi's work computer.  Hogan, who was overseeing construction of the Fred Sands Residence, compared these drawings and plans with those of the Fred Sands Residence.  The striking similarity between the drawings found on the Shahverdi's work computer, the renderings on the MSH Design's website, and the observations from the inspection of Copycat House construction led to the conclusion that the drawings for the Copycat House were copied from the drawings WHA had created for Fred Sands and for the Fred Sands Residence.

37.    On May 2, 2003, Giesbret reviewed the plans for the Copycat House on file at the Beverly Hills Building Department.  Parviz Elihu had submitted these plans on November 2, 2001.  Giesbret noted that the text on page A 1.0 of the drawings for the Copycat House contained text identical to the text on page A 1.0 of WHA plans for the Fred Sands Residence.  For example, the plans on file for the Copycat House contained the code name for the Fred Sands Residence, which was a reference to the Fred Sands family trust. The plans for the Copycat House also contained statements and references that were on the WHA plans for the Fred Sands Residence and that were specific to that project.  No reason existed for such references to be included on plans for an entirely different project, such as the Copycat House.

### Shahverdi's co-conspirators

38.    On May 2, 2003, Giesbret obtained a copy of the owner-builder building permit (dated April 9, 2002) issued for the Copycat House.   The owner-builder building permit listed Parviz Elihu as the permit applicant, and Shahverdi's former employer, Amir Construction, as the general contractor.

39.    Plaintiff is informed and believes that Amir Construction, Inc. is a closely held California corporation owned by Joseph, Parviz, Daniel, and Albert Elihu.  Plaintiff is informed and believes that Parviz Elihu and Joseph Elihu are officers and directors of Amir Construction.  Amir Construction, Inc. was formed in February 2000, just a few months before Shahverdi applied for and obtained employment with WHA.

40.    Joseph and Hayadeh Elihu, husband and wife, are the owners of 1076 Marilyn Drive, Beverly Hills, California, the location where the Copycat House was being built.  On November 23, 1999, Joseph and Hayadeh Elihu purchased the parcel of real property located at 1076 Marilyn Drive, Beverly Hills, California.

41.    EuroConcepts, Inc. ("**EuroConcepts**") is, and at all relevant times mentioned herein, was a California corporation doing business in California under the laws of the State of California.  Plaintiff is informed and believes that EuroConcepts, Inc. is a closely held corporation owned by Joseph, Parviz, Daniel, and Albert Elihu, who are officers of the corporation.   Joseph Elihu is president of EuroConcepts, Inc.

42.    Artistic renditions of the front and back of the Copycat House had been shown in the portfolio section of the MSH Design website (www.mshdesign.com/portfolio/residential/).  The heading across the top of these drawings is "Residential: Joseph Elihu Residence—14,000 Sq. Feet Italian Tuscany: Beverly Hills, CA."  Again, these drawings are very similar to the Fred Sands Residence, which is also Italian Tuscany style and was originally intended to be about 14,000 square feet (including

the garage).

43.     In or about Spring 2001, Sands met with one of the Elihu brothers at EuroConcepts offices to discuss that company providing materials for the Fred Sands Residence.  Elihu informed Sands that he knew of Sands and had followed Sands's career.  At that time, Sands provided EuroConcepts with information regarding the Fred Sands Residence, including its location.

44.     In or about spring or summer of 2001, Houck Construction, the general contractor on the Fred Sands Residence, requested EuroConcepts to provide information for a bid to supply the plumbing hardware and fixtures (including bath and kitchen accessories) for the Fred Sands Residence.  As a result of the bid process, the principals and employees of EuroConcepts had access not only to the Fred Sands Residence, but also to the architectural plans and drawings for that project.

45.     Each page of the drawing for the Fred Sands Residence contained the following statement:

> THESE DRAWINGS, DESIGN CONCEPTS AND IDEAS ARE THE PROPERTY OF WILLIAM HABLINSKI ARCHITECTURE, INC. AND SHALL NOT BE USED FOR ANY PURPOSE OTHER THAN THE CONSTRUCTION OF THE SPECIFIC PROJECT INDICATED HEREIN, AND SHALL NOT BE USED UNLESS PERSONALLY ENDORSED ON EACH DRAWING.

46.     On or about July 16, 2001, EuroConcepts submitted a bid to Houck Construction to supply plumbing hardware and fixtures (including bath and kitchen accessories) to the Fred Sands Residence.

47.     On or about November 29, 2001, EuroConcepts was awarded a contract to supply the plumbing fixtures and hardware and bath and kitchen accessories for the Fred Sands Residence at a cost of over $60,000.  EuroConcepts entered into an agreement with Houck Construction for that purpose.  Since that time through to the present, EuroConcepts has provided plumbing hardware and fixtures for the Fred Sands Residence.  As a result of its

business relationship with Houck Construction, EuroConcepts (and its officers and

employees) had access to the Fred Sands Residence, including the construction site.

48.    As a further result of EuroConcepts' business relationship with Houck

Construction, Joseph and Hayadeh Elihu, Parviz Elihu, EuroConcepts, and Amir

Construction knew of the Fred Sands Residence and had access to the Fred Sands Residence

construction site and the documents relating to this project.

49.    As a further result of EuroConcepts' business relationship, Joseph and

Hayadeh Elihu, Parviz Elihu, EuroConcepts, and Amir Construction knew that WHA had

designed the Fred Sands Residence, had created the architectural and construction drawings

and plans for the Fred Sands Residence, and provided information and assistance to the

Houck Construction.

50.    Plaintiff is informed and believes that some combination of Joseph and

Hayadeh Elihu, Parviz Elihu, EuroConcepts, and Amir Construction contacted Shahverdi for

the purpose of obtaining the WHA plans and drawings of the Fred Sands Residence to use as

the plans for the construction of the residence on Joseph and Hayadeh Elihu's property at

1076 Marilyn Drive, Beverly Hills, California.

51.    Plaintiff is informed and believes that during the course of his employment at

WHA, Shahverdi entered into an agreement with some combination of Joseph and Hayadeh

Elihu, Parviz Elihu, EuroConcepts, and Amir Construction, to design the residence on Joseph

and Hayadeh Elihu's property at 1076 Marilyn Drive, Beverly Hills, California, that all knew

would be based on or derived from the Fred Sands Residence and the plans and drawings

created by WHA.

52.    Plaintiff is informed and believes that during the course of his employment at

WHA, Shahverdi copied digital files containing the Fred Sands Residence plans and

documents using WHA  property (including its computers and software), which he

downloaded onto one or more of his personal computers.  Shahverdi did so intending to copy the Fred Sands Residence plans and drawings and to sell them as his own or to provide them to Joseph Elihu for the construction of the Copycat House. In the alternative, plaintiff is informed and believes that some combination of EuroConcepts, Amir Construction, Parviz Elihu, Joseph Elihu, and Hayadeh Elihu supplied Shahverdi with WHA drawings and plans that they obtained as a result of EuroConcepts business arrangement with Houck Construction, and that they intended that Shahverdi reproduce the WHA drawings for Joseph and Hayadeh Elihu for the construction of the Copycat House.

53.    Plaintiff is informed and believes that EuroConcepts, Amir Construction, and Parviz, Joseph, and Hayadeh Elihu intended that Shahverdi copy the Fred Sands Residence plans and drawings and modify them to produce the plans and drawings for the Copycat House.

54.    Plaintiff is informed and believes that Shahverdi used Auto-CAD software that he obtained from WHA to copy and work on the plans and drawings for the Copycat House that Shahverdi was producing for Joseph and Hayadeh Elihu.

55.    Plaintiff is informed and believes that Shahverdi subsequently duplicated the plans and drawings for the Fred Sands Residence to produce the plans and drawings for the Copycat House.  Shahverdi made minor modifications to the WHA plans and drawings when producing the plans and drawings for the Copycat House.  For example, Shahverdi substituted MSH Design as the purported author and copyright of the plans.  He also reduced the size of the proposed residence and garage.  Additionally, when Shahverdi modified the design and layout of the Fred Sands Residence, he used elements or portions of other WHA projects or designs.

56.    Shahverdi used the computer at WHA offices and WHA software to modify the Fred Sands Residence to produce the plans and drawings for the Copycat House.  He then

deleted from that computer the plans and drawing for the Copycat House that he had

produced.  Additionally, Shahverdi would work on his personal laptop computer using a disc

instead of the computer hard drive, which is a common method to avoid storing files on a

computer's hard drive.

57.    Plaintiff is informed and believes that Shahverdi then provided the modified

WHA plans and drawings to Joseph and Hayadeh Elihu, Parviz Elihu, EuroConcepts, and

Amir Construction in exchange for payment of an unknown sum of money or other

consideration.

58.    Shahverdi's deception and misappropriation extends beyond the

misappropriation of the Fred Sands Residence drawings, designs, and documents and WHA

Trade Secrets.  Again, the MSH Design website contains drawings of the outside of a

residence identified as "Joseph Elihu Residence," which appears to be copied from the Fred

Sands Residence.  Furthermore, plaintiff is informed and believes that other drawings

featured on the MSH Design website as designs created by Shahverdi are actually copies of

copyrighted works by architects other than WHA.

59.    EuroConcepts supplies materials to luxury residential projects, such as the

Fred Sands Residence and those designed by WHA, where the owners expect the design to

be distinctive.

60.    EuroConcepts was aware that WHA designed and assisted the contractors in

the construction of luxury estates (such as the Fred Sands Residence) because Parviz Elihu,

on behalf of EuroConcepts, had met with Hablinski to propose that WHA recommend or

refer its clients to EuroConcepts.

61.    As owners and officers of EuroConcepts, Joseph Elihu and Parviz Elihu are

familiar with luxury residential projects such as those produced by WHA, and they knew or

should have known that plaintiff and Fred Sands had expected the Fred Sands Residence to

be distinctive design created for the Fred Sands family.

## History of the litigation and arbitration

62.     On June 18, 2003, WHA filed a 12-count complaint in the Superior Court for the State of California, County of Los Angeles, against Mr. Shahverdi (case no. SC 077671). Mr. Shahverdi filed a motion to compel arbitration on August 20, 2003, which motion was granted on September 20, 2003.  WHA then filed a demand for arbitration with ADR Services, Inc., on October 13, 2003 (case no. 03-4412-RWT).

63.     The Superior Court dismissed the underlying case (SC 077671) with prejudice.  WHA sought re-consideration of this dismissal and appealed it. William Hablinski Architecture v. Shahverdi, 2005 Cal. App. Unpub. LEXIS 4797 (Cal. App. 2d Dist. 2005). On appeal, the Court of Appeals ruled that the dismissal with prejudice language did not deprive the court to confirm the Award to be issued from the private contractual arbitration. *Id.*

64.     ADR Services, Inc. initially set the arbitration for February 7, 2005.  The parties agreed to vacate that date.

65.     Mr. Shahverdi resisted discovery by being unavailable for deposition dates; his deposition never concluded.  Mr. Shahverdi also resisted discovery by producing intentionally-damaged hard drives of his computer in response to court and arbitration orders to produce electronic data to the court-appointed computer forensic expert, to whom WHA has been advancing payments.  Due to Shahverdi's damaging of the drives, and based upon the recommendation of the court-appointed expert, the drives were shipped to additional experts in computer forensic hardware restoration, TLSI, again with all costs and expenses being advanced by WHA.  Eventually that process revealed gigabytes of data, which were reviewed in camera by the arbitrator to address Shahverdi's claims of privilege.  Shahverdi had attached privilege claims to nearly the entirety of the data, including voluminous

autoCADD files, picture files, text files, and Excel files.  The Arbitrator rejected all of Shahverdi's claims of privilege.  The data recovered revealed the great scope and extent of Shahverdi's wrongdoing.

66.    The arbitrator ruled on multiple contested discovery issues and issues relating to the merits including granting WHA's motion for summary adjudication of Shahverdi's cross-claim.  This ruling arrived only after Shahverdi delayed the arbitrator's determination on it by nearly two years, repeatedly switching counsel, claiming to be not informed the date of the hearing, claiming inadequate notice despite having over eight months to prepare and otherwise causing the hearing date to be moved.

67.    WHA repeatedly attempted to schedule the hearing on the merits of its claims against Shahverdi.  The hearing on the merits had been delayed due to the alleged unavailability of Mr. Shahverdi's counsel (counsel number 4 or 5).  The arbitrator then held an Arbitration Setting Conference on September 9, 2008, at which Mr. Shahverdi's counsel suggested dates for the hearing.  When it appeared that the arbitrator would hold the hearing on those dates, Mr. Shahverdi's counsel then revealed that he would represent Mr. Shahverdi for motions only, not the arbitration itself, and that he intended to file a motion to dismiss for failure to prosecute. Finally, Shahverdi's counsel stated that because he did not have Mr. Shahverdi's schedule, he could not agree to any dates for the arbitration on behalf of Mr. Shahverdi.  The arbitrator then continued the conference, ordering Mr. Shahverdi to attend the continued session personally.

68.    At the continued conference, two weeks later, Mr. Shahverdi again asked for a continuance.  The arbitrator denied the continuance.  Mr. Shahverdi then stated that the arbitration dates would work for him and agreed to arbitrate on those dates.

69.    Mr. Shahverdi's counsel moved to dismiss the arbitration for failure to prosecute timely.  The motion was heard on December 9, 2008.  The arbitrator denied the

motion.

70.    On December 7, 2008, Mr. Shahverdi sought to continue the arbitration for another month or two because of the unavailability of one of his witnesses, an architectural historian that he wanted to fly out from Italy.  The arbitrator denied the continuance and allowed Mr. Shahverdi's witness to testify at a later date.

71.    On December 15, the day prior to the arbitration, Mr. Shahverdi's counsel again requested a continuance.  The arbitrator denied it.  Mr. Shahverdi's bankruptcy case followed: according to Mr. Shahverdi's counsel, "as a continuance will not be granted . . . Mr. Shahverdi feels that he has no choice but to file for bankruptcy protection."

72.    On December 16, the merits hearing continued with Shahverdi present and represented by counsel.  The Arbitrator took live testimony and received documents and items into evidence.  The arbitration was interrupted later that day when Shahverdi provided service of his just-filed bankruptcy petition.

73.    Since the filing of the Petition, Plaintiff has filed a motion for relief from the automatic stay in order to move forward with the arbitration.  As of the date of this complaint, the Court has not ruled on the motion for relief from stay.

### Mr. Shahverdi's current employment

74.    Mr. Shahverdi filed a declaration with his second amended plan in this bankruptcy case (at docket no. 31).  That declaration attaches a redacted design contract for a client in zip code 90077, which covers Bel-Air, among other localities within the city of Los Angeles, California.  The contract is with Mr. Shahverdi's design firm, MSh Design.  Mr. Shahverdi's work on this contract may compete directly with the services offered by WHA.

### FIRST CAUSE OF ACTION
### (Tortious Interference with Contract)

74.    Plaintiff re-alleges and incorporates herein by reference every allegation

contained in paragraphs 1 through 73.

75.    At all times herein mentioned, defendant knew of the existence of the WHA/Fred Sands Agreement and provisions therein obligating WHA to ensure that no other "representation" of the Fred Sands Residence would be reproduced or published in any media. Defendant further understood that, in accordance with the WHA/Fred Sands Agreement, the Fred Sands Residence was to be distinctive and designed by WHA exclusively for the Fred Sands family. Defendant further knew that WHA required all its employees to maintain WHA and client confidentiality, to avoid conflicts of interest, and to avoid conflicting secondary employment.  Defendant acknowledged his understanding of the importance of those terms and conditions upon accepting the Employment Offer and signing the necessary documents to commence employment with WHA.

76.    Defendant, lacking any privilege or justification, through conspiracy and solicitation, and with malice, intentionally induced and thereby caused WHA to breach the WHA/Sands Agreement by (a) misappropriating WHA Trade Secrets; (b) copying or causing to have copied confidential copyrighted project design documents; (c) falsely representing that WHA designs were authored by or original to Shahverdi; (d) selling or purchasing the wrongly attributed designs; and (e) using the misappropriated WHA Trade Secrets to construct the Copycat House.

77.    The acts alleged herein constitute tortious interference by defendant with the WHA/Sands Agreement.

78.    At the time defendant interfered with the WHA/Sands Agreement by, among other things, providing copies of the confidential designs for the Fred Sands Residence to MSH Designs, Joseph and Hayadeh Elihu, EuroConcepts, Amir Construction, and/or Parviz Elihu, defendant knew or in the exercise of reasonable diligence should have known that those designs could and would be copied by individuals or companies not authorized to do

so, and that the copied project design documents and misappropriated WHA Trade Secrets

would be used, and were in fact used, to construct the Copycat House.

79.     Defendant's conduct caused plaintiff damages, including diminution in value

of the services provided under the WHA/Sands Agreement in an amount to be proven at trial,

but which exceeds the jurisdictional requirements of this Court.

80.     Defendant's conduct, unless and until enjoined and restrained by this court,

will cause great and irreparable injury to Plaintiff because defendant will continue to use

WHA Trade Secrets and property to construct the Copycat House, or other houses, that will

continue to interfere with the WHA/Sands Agreement.  Plaintiff has no adequate remedy at

law for the injuries currently being suffered and threatened; legal remedies would be

inadequate to prevent further harm to Plaintiff so long as defendant continues to

misappropriate WHA Trade Secrets and use those to construct the Copycat House or other

houses or buildings.  It will be impossible for Plaintiff to determine the precise amount of the

damage it will suffer if defendant's conduct is not restrained.  By reason of the foregoing,

plaintiff is entitled to preliminary and permanent injunctive relief against defendant, his

agents, employees, assigns, affiliates, and all persons acting in concert with him, restraining

defendant from further acts causing injury to plaintiff, including any further use or disclosure

of WHA property, and to order defendants to return to plaintiff or destroy all items

embodying WHA Trade Secrets.

81.     Plaintiff is informed and believes and, upon such, alleges that defendant's acts

described above were done with oppression, fraud, and malice thereby entitling plaintiff to an

award of punitive damages in an amount appropriate to punish him and to deter others from

engaging in similar conduct.

## SECOND CAUSE OF ACTION
### (Conversion)

82.     Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 81.

83.     Plaintiff is, and at all times relevant herein, was the author and owner of the designs, plans, and drawings produced by Shahverdi for Joseph and Hayadeh Elihu to construct the Copycat House ("**Converted Property**").  The value of such designs, plans, and drawings exceeds $300,000.00.

84.     Shahverdi wrongfully interfered with plaintiff's interest in the Converted Property by asserting control and ownership over the Converted Property and by applying the Converted Property to his use.  Defendant's interference with the Converted Property was sufficiently substantial to require defendant to pay the full value of the property. Defendant's actions include, but are not limited to, his providing the designs, plans, and drawings to Joseph and Hayadeh Elihu, EuroConcepts, Amir Construction, and/or Parviz Elihu to be used to construct the Copycat House on the Marilyn Street property.

85.     As a direct and proximate result of defendant's acts of conversion, plaintiff has sustained damages (including all compensatory damages) in an amount to be proven at trial.  Alternatively, plaintiff is entitled to damages and repossession of the Converted Property and will seek its election of remedies at trial.  Plaintiff is also entitled to compensation for the time and money expended in pursuit of its property.

86.     Plaintiff is also entitled (a) to the imposition of a constructive trust on the Converted Property and its fruits and (b) to a tracing with respect to the Converted Property.

87.     Plaintiff is entitled to an equitable lien on the Converted Property.

88.     Plaintiff is informed and believes and, upon such, alleges that defendant's acts described above were done with oppression, fraud, and malice thereby entitling plaintiff to an

award of punitive damages in an amount appropriate to punish him and to deter others from

engaging in similar conduct.

89.    Defendant's wrongful conduct, unless and until enjoined and restrained by

this court, will cause great and irreparable injury to plaintiff because defendant will continue

to use Converted Property and will continue to have the ability to disclose WHA's Converted

Property to others.  Plaintiff has no adequate remedy at law for the injuries currently being

suffered and threatened; legal remedies would be inadequate to restore plaintiff's goodwill

and the damages to plaintiff so long as defendant continues to use the Converted Property.  It

will be impossible for plaintiff to determine the precise amount of the damage it will suffer if

defendant's conduct is not restrained.  By reason of the foregoing, plaintiff is entitled to

preliminary and permanent injunctive relief against defendant, his agents, employees,

assigns, affiliates, and all persons acting in concert with him, restraining defendant from

further acts causing injury to plaintiff, including any further use or disclosure of WHA

property, and to order defendant to return to plaintiff or destroy all items embodying WHA

Trade Secrets.

## THIRD CAUSE OF ACTION
### (Trespass to Chattel)

90.    Plaintiff re-alleges and incorporates herein by reference every allegation

contained in paragraphs 1 through 89.

91.    Through the actions as alleged above, defendant interfered with and disturbed

plaintiff's possession of the Converted Property by taking the Converted Property from

plaintiff's premises and using the Converted Property for his purposes.  In taking such

actions, defendant exercised control and authority over the Converted Property that was

inconsistent with plaintiff's possession of the Converted Property.  Defendant intentionally

interfered with plaintiff's possession of the Converted Property.

92.    Additionally, Shahverdi interfered with plaintiff's property, namely its computers, software, and electronic files stored on plaintiff's computers, by using those computers, software, and electronic files for his own benefit and to produce the designs, plans, and drawings of the Copycat House.  In using plaintiff's computers and electronic files for his benefit and the benefit of others, Shahverdi exercised control or authority over plaintiff's property that was inconsistent with plaintiff's possession of that property. Shahverdi intentionally interfered with plaintiff's possession of its property.

93.    As a direct and proximate result of defendant's trespass, plaintiff has sustained damages (including all compensatory damages) in an amount to be proven at trial. Alternatively, plaintiff is entitled to damages and repossession of the Converted Property and will seek its election of remedies at trial.  Plaintiff is also entitled to compensation for the time and money expended in pursuit of its property.

94.    Plaintiff is also entitled (a) to the imposition of a constructive trust on the Converted Property and its fruits and (b) to a tracing with respect to the Converted Property.

95.    Plaintiff is entitled to an equitable lien on the Converted Property.

96.    Plaintiff is informed and believes and, upon such, alleges that defendant's acts described above were done with oppression, fraud, and malice thereby entitling plaintiff to an award of punitive damages in an amount appropriate to punish him and to deter others from engaging in similar conduct.

97.    Defendant's wrongful conduct, unless and until enjoined and restrained by this court, will cause great and irreparable injury to plaintiff because defendant will continue to use Converted Property and will continue to have the ability to disclose WHA Trade Secrets to others.  Plaintiff has no adequate remedy at law for the injuries currently being suffered and threatened; legal remedies would be inadequate to restore Plaintiff's goodwill and damage to plaintiff so long as defendant continues to use the Converted Property.  It will

be impossible for plaintiff to determine the precise amount of the damage it will suffer if

defendant's conduct is not restrained.  By reason of the foregoing, plaintiff is entitled to

preliminary and permanent injunctive relief against defendant, his agents, employees,

assigns, affiliates, and all persons acting in concert with him, restraining defendant from

further acts causing injury to plaintiff.

### FOURTH CAUSE OF ACTION
**(Breach of Contract)**

98.     Plaintiff realleges and incorporates herein by reference every allegation

contained in paragraphs 1 through 97.

99.     WHA and Shahverdi entered into a valid written Employment Agreement on

May 22, 2000.  The terms of the Employment Agreement are set forth in Exhibit "A" and

Exhibit "B," both of which are incorporated herein by reference. The Employment

Agreement outlines specific responsibilities of WHA employees.  Specifically, Shahverdi, in

accepting employment with WHA, agreed to the following:

Section 30.   CONFLICTS OF INTEREST AND GIFTS.   Avoid any actual or
potential conflict of interest with Hablinski, including relationships with suppliers,
clients, and all other organizations or individuals doing or seeking to do business with
Hablinski.

Section 31. SECONDARY EMPLOYMENT.   Work on secondary employment
projects, including phone calls, is not permitted at any time in the Hablinski office.
You may be required to resign from secondary employment if it adversely affects
your job performance at Hablinski.

Section 32.   CONFIDENTIALITY.   All employees are required to sign a
Confidentiality Agreement.   All of Hablinski's transactions are completely
confidential.  Do not discuss work outside the office.  If you have any questions
regarding confidentiality or receive a request to divulge confidential information,
contact Richard Manion immediately.

99.     Shahverdi breached the terms and conditions of the Employment Agreement

by, among other things, (1) discussing and divulging WHA's proprietary information

concerning the Fred Sands Residence with individuals and/or entities unrelated to WHA or

the Fred Sands Residence project; (2) engaging in secondary employment with individuals and/or entities unrelated to WHA who expressed interest in obtaining, and did in fact obtain by illicit means, the design, plans and drawings of the Fred Sands Residence; (3) converting property owned by WHA to his own use; and (4) violating the duty of confidentiality concerning the Fred Sands Residence.

100.    WHA has fully performed all conditions, covenants, and promises required by the Employment Agreement in accordance with its terms and conditions of the Employment Agreement, except for those WHA was prevented from performing, or those that were waived or excused by Shahverdi's misconduct.

101.    WHA fully performed its obligations and complied with all conditions of the Employment Agreement.

102.    Shahverdi's unexcused and unjustified failure to comply with the terms of the Employment Agreement by the acts alleged herein constitute a material breach of his duties and obligations under the Employment Agreement with WHA.

103.    Shahverdi's conduct directly and proximately resulted in measurable damages to Plaintiff, including lost profits, diminution in value of the services provided under the WHA/Fred Sands Agreement, and expenses incurred in recruiting and filling Shahverdi's position. The amount of these damages will be proven at trial.

**FIFTH CAUSE OF ACTION**
**(Breach of the Implied Covenant of Good Faith and**
**Fair Dealing)**

105.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 104.

106.    Implied in the written Employment Agreement between WHA and Shahverdi is a covenant of good faith and fair dealing pursuant to which Shahverdi impliedly

covenanted that he would in good faith and in the exercise of fair dealing, deal with WHA fairly and honestly, and that he would do nothing to impair, interfere with, hinder, or potentially injure WHA's rights under the Employment Agreement.

107.    By Shahverdi's actions as alleged herein Shahverdi breached his duties and obligations under the implied covenant of good faith and fair dealing in that, among other things, he evaded the spirit of the bargain that Shahverdi had made with WHA and otherwise failed to do everything the Employment Agreement presupposed Shahverdi would do to accomplish its purpose.

108.    Shahverdi's conduct directly and proximately resulted in measurable damages to Plaintiff, including lost profits, diminution in value of the services provided under the WHA/Sands Agreement, expenses incurred in recruiting and filling Shahverdi's position. The amount of these damages will be proven at trial.

## SIXTH CAUSE OF ACTION
### (Unjust Enrichment)

109.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 108.

110.    During the course of Shahverdi's employment with Plaintiff, Plaintiff conferred numerous benefits upon Shahverdi, including, but not limited to, compensation, access to the designs, plans, and drawings for the Fred Sands Residence, and other fringe benefits.

111.    As a result of providing services to Joseph and Hayadeh Elihu and the designs, plans, and drawings for the Copycat House, Shahverdi was unjustly enriched in that he received a benefit from Joseph and Hayadeh Elihu at plaintiff's expense.  Plaintiff received no compensation for Shahverdi's services or the designs, plans, and drawings for the Copycat House.

112.    Plaintiff is informed and believes, and upon such alleges, that Shahverdi received some compensation or consideration for the services he provided to Joseph and Hayadeh Elihu.

113.    As a result of Shahverdi's unjust enrichment, plaintiff is entitled to restitution from Shahverdi of the reasonable value of the tangible and intangible property conferred on Shahverdi by plaintiff, and which are due and unpaid, in an amount to be proven at trial.

114.    As a further result of Shahverdi's unjust enrichment, plaintiff is entitled to restitution from Shahverdi of the reasonable value of the services conferred on defendants by plaintiff in an amount to be proven at trial.

115.    Plaintiff is entitled to an order declaring Shahverdi holds the property described above in trust for plaintiff; declaring plaintiff is the owner of the property described above; and compelling Shahverdi to return the property to plaintiff.

### SEVENTH CAUSE OF ACTION
**(Promissory Estoppel)**

116.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 115.

117.    Defendant Shahverdi freely and voluntarily promised to maintain the confidentiality of WHA Trade Secrets, not to use WHA property (including WHA Trade Secrets) for his own use or disclose it to third parties, and not to undertake other employment that would conflict with his work for plaintiff.  These promises were made in writing by Shahverdi and were of his own accord.

118.    Plaintiff relied upon Shahverdi's promises to its detriment.

119.    Plaintiff's reliance upon Shahverdi's promises was reasonable and foreseeable.

120.    As alleged herein, Shahverdi breached his promises to plaintiff.

121.     As a direct and proximate result of Shahverdi's breaches of his promises and plaintiff's reliance upon Shahverdi's promises, plaintiff has sustained actual damages, including diminution in the value of services provided under the WHA/Sands Agreement, and expenses incurred in recruiting and filling Shahverdi's position, in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION
### (Misappropriation of Trade Secrets)

**122.**     Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 121.

123.     WHA Trade Secrets and WHA's Design Library derive economic value from not being known to the public and to WHA competitors.

124.     WHA has taken and does take reasonable efforts under the circumstances to maintain the secrecy of WHA Trade Secrets and the Design Library.

125.     Shahverdi knew that the WHA Trade Secrets and the Design Library belonged to WHA, that he was to use the WHA Trade Secrets and the Design Library only to perform his duties as a WHA employee, and that he was not to use WHA Trade Secrets or the Design Library for any other purpose or to disclose WHA Trade Secrets or the Design Library to others.

126.     The defendants misappropriated WHA Trade Secrets and the Design Library by Shahverdi's use of those confidential trade secrets in his personal business, MSH Design, including creating the plans and drawings for the Copycat House, and by the use of WHA Trade Secrets and the Design Library in the building and construction of the Copycat House.

127.     Plaintiff did not expressly or impliedly consent or authorize defendants to use WHA Trade Secrets or the Design Library. Defendants acquired WHA Trade Secrets by improper means.

128.    As a direct and proximate result of defendant's improper use of WHA Trade Secrets, plaintiff has suffered actual damages in an amount to be proven at trial.  As a further direct and proximate result of defendant's misappropriation, defendant was unjustly enriched in an amount to be proven at trial.

129.    Plaintiff is entitled to a reasonable royalty as a result of Shahverdi's use of WHA Trade Secrets in an amount to be proven at trial.

130.    Plaintiff is informed and believes and, upon such alleges, that defendant's acts were willful and malicious in that Shahverdi obtained access to WHA's Trade Secrets as an employee and breached his obligations to plaintiff and by wrongfully using WHA Trade Secrets for his benefit.  Plaintiff is entitled to punitive damages under California Civil Code §§3295 and 3426.3.

131.    Plaintiff is also entitled to reasonable attorneys' fees pursuant to Civil Code § 3426.4 because it had to employ attorneys, who are active members of the State Bar of California, to file and prosecute this action and is thus obligated to those attorneys for a reasonable fee for their services in this matter.

**132.**    Defendant's wrongful conduct, unless and until enjoined and restrained by this court, will cause great and irreparable injury to Plaintiff because defendant will continue to use WHA Trade Secrets and will continue to have the ability to disclose them to others. Plaintiff will suffer lost business and lost profits.  Plaintiff has no adequate remedy at law for the injuries currently being suffered and threatened; legal remedies would be inadequate to restore Plaintiff's goodwill and prevent further damages to plaintiff so long as defendant continues to misappropriate Plaintiff's trade secrets.  It will be impossible for Plaintiff to determine the precise amount of the damage it will suffer if defendant's conduct is not restrained.  By reason of the foregoing, plaintiff is entitled to preliminary and permanent injunctive relief against defendant, his agents, employees, assigns, affiliates, and all persons

acting in concert with him, restraining defendant from further acts causing injury to plaintiff,

including any further use or disclosure of WHA property, and to order defendant to return to

plaintiff or destroy all items embodying WHA Trade Secrets.

## NINTH CAUSE OF ACTION
### (Unfair Competition [Business & Professions Code § 17200])

133.    Plaintiff re-alleges and incorporates herein by reference every allegation

contained in paragraphs 1 through 132.

134.    Defendant engaged in unlawful, unfair, or fraudulent business practices in

violation of California Business and Professions Code §§ 17200 *et seq.* by conducting the

acts alleged above (e.g., Shahverdi breaching his employment agreement with WHA,

misappropriating WHA Trade Secrets; passing off WHA designs, plans and drawings as his

own; and making copies of WHA designs available to people other than for whom the

designs were created).

135.    Plaintiff is informed and believes and, upon such, alleges that defendant

performed these acts to injure plaintiff.

136.    Plaintiff is entitled to recover from defendant the gains, profits, property, and

unjust enrichment that he acquired because of his unfair competition.

**137.**    As a direct and proximate result of Shahverdi's acts, plaintiff has been and

will continue to be injured, including lost sales and dilution of its goodwill.  These wrongful

acts caused plaintiff imminent and irreparable harm.  The amount of damage sustained by

plaintiff will be difficult to determine if these acts continue.  Plaintiff has no adequate

remedy at law against these acts by defendant.  Accordingly, plaintiff is entitled to an

injunction restraining defendant from engaging in further unlawful conduct.

## TENTH CAUSE OF ACTION
### (Common Law Unfair Competition [Passing Off])

138.    Plaintiff re-alleges and incorporates herein by reference every allegation

contained in paragraphs 1 through 137.

139.    By conducting the acts alleged above, Shahverdi intended to imitate WHA designs, plans, and drawings to deceive or confuse Joseph and Hayadeh Elihu and the public into buying his work because they believed that they were purchasing WHA designs, plans, and drawings.

140.    In selling his designs, plans, and drawings, and in offering his design services today, Shahverdi is and was directly competing against plaintiff.

141.    Shahverdi's conduct, as alleged above, constitutes unfair competition under California common law.

142.    As a direct and proximate result of defendant's conduct, plaintiff has and will continue to suffer damages in its business, reputation and goodwill, and to lose sales and profits that it would have made if not for the defendant's conduct.  The amount of these damages will be proven at trial.

143.    As a further direct and proximate result of defendant's conduct, plaintiff will continue to suffer irreparable harm to its reputation and goodwill for which plaintiff has no adequate remedy at law.  Accordingly, plaintiff is entitled to an injunction restraining defendant from engaging in further unlawful conduct.

144.    Plaintiff is informed and believes and, upon such alleges, that defendant's acts as described above were done with oppression, fraud, and malice, entitling plaintiff to an award of punitive damages in an amount to be established at trial.

## ELEVENTH CAUSE OF ACTION
### (Breach of Confidential Relationship)

145.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 144.

146.    On or about May 2000, and again on September 2002, Shahverdi signed an

Employment Agreement.  Section 32 of the Employee Handbook, comprising a portion of

the Employment Agreement, provides as follows:

> Section 32.    CONFIDENTIALITY.    All employees are required to sign a Confidentiality Agreement.    All of Hablinski's transactions are completely confidential.  Do not discuss work outside the office.  If you have any questions regarding confidentiality or receive a request to divulge confidential information, contact Richard Manion immediately.

147.    Throughout Shahverdi's employment with WHA, and in reliance upon

Shahverdi's having acknowledged in writing his obligation to maintain as confidential WHA

Trade Secrets and the Design Library, plaintiff disclosed and conveyed confidential and

novel information, including, but not limited to, WHA Trade Secrets and the Design Library,

to Shahverdi about building design and construction.

148.    At the time such confidential and novel information, including, but not limited

to, WHA Trade Secrets and the Design Library, was disclosed and conveyed to Shahverdi, he

knew the information was confidential and novel and not for public disclosure.  At all times

herein, a mutual understanding existed between plaintiff and Shahverdi that Shahverdi would

maintain the confidentiality of the WHA confidential and novel information.

149.    In or about 2001, Shahverdi disclosed plaintiff's confidential and novel

information including, but not limited to, WHA Trade Secrets and the Design Library, to (a)

individuals and/or entities unrelated to WHA, (b) to other defendants in providing them with

the designs, plans, and drawings for the Copycat House, and (c) the public through his

website.

150.    Shahverdi's acts, as alleged above, constitute a breach of a confidential

relationship between plaintiff and defendant.

151.    As a direct and proximate result of defendant's conduct, plaintiff has and will

continue to suffer damages in its business, reputation and goodwill, and to lose sales and

profits that it would have made if not for the defendant's conduct.  Plaintiff is also entitled to

the amount of defendant's profits from his use, license, or sale of WHA Trade Secrets and as a result of his breach of his confidential relationship. The amount of these damages will be proven at trial.

152.    As a further direct and proximate result of defendant's conduct, plaintiff will continue to suffer irreparable harm to its reputation and goodwill for which plaintiff has no adequate remedy at law. Accordingly, plaintiff is entitled to an injunction that restrains defendant from engaging in further unlawful conduct.

153.    Plaintiff is informed and believes and, upon such, alleges that defendant's acts as described above were done with oppression, fraud, and malice, entitling plaintiff to an award of punitive damages in an amount to be established at trial.

## TWELFTH CAUSE OF ACTION
### (Fraud)

154.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 153.

155.    When he signed his Employment Agreement on May 2000, and again on September 2002, and specifically by acknowledging Sections 30, 31 and 32 of the Employee Handbook, comprising a portion of the Employment Agreement, Shahverdi misrepresented material facts to plaintiff by making false promises concerning his willingness to adhere to the obligations set forth in his Employment Agreement, all without intention of performing those promises; Shahverdi further concealed information from plaintiff, namely his intentions of misappropriating WHA Trade Secrets and the Design Library, despite his obligations as plaintiff's employee to disclose that information. Shahverdi's misrepresentations include, but are not limited to, the following: (1) that he would keep WHA Trade Secrets and the Design Library confidential; (2) that he would not use WHA Trade Secrets, the Design Library or other WHA property (such as its computers and software) for his personal use; (3)

that he would not disclose WHA Trade Secrets or the Design Library to others without plaintiff's consent; and (4) that he would not engage in personal business activities that would conflict with his obligations to plaintiff.

156.    Shahverdi knew his misrepresentations were false and/or that he was concealing a material fact, in that Shahverdi intended to, among other things, misappropriate WHA Trade Secrets and the Design Library.

157.    Shahverdi intended to induce plaintiff to rely on his misrepresentations and to employ him and retain him as an employee, so that during his employment, plaintiff would give Shahverdi access to WHA property (including WHA Trade Secrets and the Design Library) and disclose to him WHA Trade Secrets and the Design Library, all of which Shahverdi intended to misappropriate for his own personal gain.

158.    Based on Shahverdi's oral assurances and his written acknowledgement of WHA's policies of confidentiality and non-disclosure (set forth in Sections 30, 31 and 32 of the Employee Handbook, comprising a portion of the Employment Agreement), plaintiff justifiably and reasonably relied on Shahverdi's misrepresentations.

159.    As a direct and proximate result of Shahverdi's fraud as alleged above, plaintiff was induced to hire Shahverdi and retain him as an employee during which time Shahverdi engaged in business activities in which he used WHA Trade Secrets and the Design Library, all to plaintiff's detriment.  As a result, plaintiff has sustained and will continue to sustain damages, including lost goodwill, lost profits, lost future profits and harm to plaintiff's reputation, in an amount to be proven at trial.

160.    Plaintiff is entitled to prejudgment interest.

161.    As a further direct and proximate result of defendant's conduct, plaintiff will continue to suffer irreparable harm to its reputation and goodwill for which plaintiff has no adequate remedy at law.  Accordingly, plaintiff is entitled to an injunction that restrains

defendant from engaging in further unlawful conduct.

162.    In committing the acts alleged herein, Shahverdi acted with oppression, fraud, malice, and in conscious disregard of plaintiff's rights.  Accordingly, plaintiff is entitled to punitive damages according to proof at the time of trial.

### THIRTEENTH CAUSE OF ACTION
### (Negligent Misrepresentation)

163.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 162.

164.    Because he always intended to misappropriate WHA Trade Secrets and the Design Library for his own personal gain, Shahverdi did not have reasonable grounds for believing the misrepresentations alleged above were true.

165.    As a direct and proximate result of Shahverdi's misrepresentations, plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

### FOURTEENTH CAUSE OF ACTION
### (Breach of the Duty of Loyalty)

166.    Plaintiff re-alleges and incorporates herein by reference every allegation contained in paragraphs 1 through 165.

167.    As plaintiff's employee, Shahverdi was required to act with due care and to give preference to plaintiff's business.  In addition to the obligations set forth in the Employment Agreement, California Labor Code §§ 2850 through 2865 set forth Shahverdi's obligations as an employee to his employer, plaintiff herein.

168.    Shahverdi breached his obligations to plaintiff by doing the acts alleged above, including, but not limited to (a) misappropriating WHA Trade Secrets; (b) copying and/or causing to have copied confidential copyrighted project design documents; (c) falsely representing that WHA designs were authored by or original to Shahverdi; (d) selling and purchasing the wrongly attributed designs; and (e) using the misappropriated WHA Trade

Secrets to construct the Copycat House.

169.    As a direct and proximate result of Shahverdi's breach of his obligations to plaintiff, plaintiff has sustained and will continue to sustain damages in an amount to be proven at trial.

## FIFTEENTH CAUSE OF ACTION
### (Exception To Discharge—Fraud [11 U.S.C. Section 523(a)(2)])

170.    Plaintiff realleges as though fully set forth paragraphs 1 through 169 of this complaint.

171.    In committing the acts alleged herein, Shahverdi obtained property of WHA by false pretenses, false representation, or actual fraud.  The debt he owes WHA as a result of these actions is for money, services, or property, obtained by false pretenses, false representation, or actual fraud, thereby excepting the debt from discharge under 11 U.S.C. § 523(a)(2).

## SIXTEENTH CAUSE OF ACTION
### (Exception To Discharge—Embezzlement [Cal. Penal Code § 508; 11 U.S.C. Section 523(a)(4)])

172.    Plaintiff realleges as though fully set forth paragraphs 1 through 171 of this complaint.

173.    Shahverdi was a clerk, agent, or servant of WHA.

174.    By virtue of his employment as a clerk, agent, or servant of WHA, Shahverdi came into control or care of the Trade Secrets and Design Library of WHA.

175.    Shahverdi fraudulently appropriated to his own use the Trade Secrets and Design Library of WHA.

176.    In committing the acts alleged herein, Shahverdi embezzled property of WHA.  Any debt he owes to WHA is due to embezzlement, thereby excepting his debt from discharge under 11 U.S.C. § 523(a)(4).

## SEVENTEENTH CAUSE OF ACTION
### Petition To Compel The Continuation Of The Arbitration

177.    Plaintiff realleges as though fully set forth paragraphs 1 through 176 of this complaint.

178.    There is a preexisting finding by the State Court based upon a motion to compel arbitration filed by Mr. Shahverdi that a valid arbitration agreement exists between Shahverdi and Hablinski.  Shahverdi is now estopped to deny otherwise.

179.    Arbitration has already commenced between the parties.

180.    Under state law as well as federal law as set forth in the Federal Arbitration Act, Hablinski has the right to have his disputes with Shahverdi arbitrated.  Therefore, Hablinski asks this Court to order a continuation of the arbitration before Judge Thomas, at ADR Services, Inc. to resolve all issues in this Complaint, except those for which the Arbitrator may lack jurisdiction to decide.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays that judgment be entered in its favor and against Defendant as follows:

## ON THE FIRST CAUSE OF ACTION:

a.    For compensatory damages in an amount in excess of $ 500,000 including lost sales and expenses incurred, according to proof at trial;

b.    For diminution in value of the services provided under the WHA/Fred Sands Agreement;

c.    For injunctive relief enjoining Defendants from further interference;

       d.     For punitive and exemplary damages.

**ON THE SECOND CAUSE OF ACTION:**

       a.   For compensatory damages in an amount in excess of $ 500,000 according to proof at trial;

       b.   Alternatively, for repossession of the converted property upon election of remedies at trial by Plaintiff;

       c.   For compensation for the time and money expended in pursuit of the property;

       d.   For an imposition of an equitable lien on the converted property

       e.   For emotional distress;

       f.   For injunctive relief enjoining defendants from dissipating plaintiff's property;

       g.   For punitive and exemplary damages.

**ON THE THIRD CAUSE OF ACTION:**

       a.   For compensatory damages in an amount in excess of $ 500,000 according to proof at trial;

       b.   Alternatively, for repossession of the converted property upon election of remedies at trial by Plaintiff;

       c.   For compensation for the time and money expended in pursuit of the property;

       d.   For an imposition of an equitable lien on the converted property;

       e.   For emotional distress;

       f.   For injunctive relief enjoining defendants from dissipating plaintiff's property;

       g.   For punitive and exemplary damages.

**ON THE FOURTH CAUSE OF ACTION:**

       a.   For compensatory damages in excess of $ 500,000, including lost sales, diminution in the value of services provided under the WHA/Sands Agreement and expenses incurred in recruiting for and filling Shahverdi's position, all according to proof at trial.

**ON THE FIFTH CAUSE OF ACTION:**

       a.   For compensatory damages in excess of $500,000, including lost sales,

diminution in the value of services provided under the WHA/Sands Agreement
and expenses incurred in recruiting for and filling Shahverdi's position, according
to proof at trial.

**ON THE SIXTH CAUSE OF ACTION:**

    a.  For restitution to Plaintiff of the reasonable value of the tangible and intangible
property conferred on Shahverdi by WHA, which amounts are due and remain
unpaid, according to proof at trial;

    b.  For restitution to Plaintiff of the reasonable value of the services conferred on
Defendants by WHA;

    c.  For an order declaring that Shahverdi holds the property described above in trust
for WHA;

    d.  For an order declaring WHA the owner of the property described above;

    e.  For an order compelling Shahverdi to convey the property to WHA.

**ON THE SEVENTH CAUSE OF ACTION:**

    a.  For compensatory damages in excess of $ 500,000, including lost sales,
diminution in the value of services provided under the WHA/Sands Agreement
and expenses incurred in recruiting for and filling Shahverdi's position, according
to proof at trial.

**ON THE EIGHTH CAUSE OF ACTION:**

    a.  For actual damages according to proof at trial;

    b.  For disgorgement by Defendant and restitution to plaintiff of all ill-gotten profits;

    c.  For injunctive relief restraining Defendant from continuing to use, disclose, or
distribute to others Plaintiff's trade secrets;

    d.  For punitive damages in the amount of two times Plaintiff's actual damages;

    e.  For reasonable attorneys fees, pursuant to Cal. Civ. Code § 3426.4;

    f.  For a reasonable royalty.

**ON THE NINTH CAUSE OF ACTION:**

    a.  For restitution to Plaintiff of property and valuable services acquired by

defendants as a result of their unlawful, unfair, and/or fraudulent business

practices;

b.  For injunctive relief restraining defendants from engaging in further unlawful,

unfair and/or fraudulent conduct, including any further use of WHA's property.

**ON THE TENTH CAUSE OF ACTION:**

a.  For compensatory damages in excess of $ 500,000, including lost goodwill, lost

sales, lost profits, lost future profits and harm to WHA's reputation in the

profession, according to proof at trial;

b.  For injunctive relief restraining defendant and all those acting in concert with

defendant from engaging in further acts of unfair competition;

c.  For punitive and exemplary damages.

**ON THE ELEVENTH CAUSE OF ACTION:**

a.  For compensatory damages in excess of $ 500,000, including lost sales and

Shahverdi's profits from the use, license, or sale of WHA's unique trade secrets,

according to proof at trial;

b.  For injunctive relief restraining Shahverdi from disclosing or using Plaintiff's

trade secrets;

c.  For punitive and exemplary damages;

d.  For reasonable attorneys fees.

**ON THE TWELVETH CAUSE OF ACTION:**

a.  For compensatory damages in excess of $ 500,000, including lost sales, according

to proof at trial;

b.  For prejudgment interest on Plaintiff's loss;

c.  For injunctive relief restraining Shahverdi from further use, enjoyment and/or

disclosure of WHA's trade secrets and copyrighted works, including the posting

or maintaining an image of any WHA works on any website;

d.  For punitive and exemplary damages.

**ON THE THIRTEENTH CAUSE OF ACTION:**

    a.  For compensatory damages in excess of $ 500,000, including lost sales, according to proof at trial;

**ON THE FOURTEENTH CAUSE OF ACTION:**

    a.  For compensatory damages in excess of $ 500,000, including lost sales, according to proof at trial;

**ON THE FIFTEENTH AND SIXTEENTH CAUSES OF ACTION:**

    a.  For a determination that plaintiff's claims against defendant are non-dischargeable.

**ON THE SEVENTEENTH CAUSE OF ACTION:**

    a.  For an Order that the issues in this Complaint be determined in the continued arbitration between the parties before the Hon. Judge Thomas at ADR Services, Inc.

**ON ALL CAUSES OF ACTION:**

    a.  For prejudgment and post-judgment interest at the legal rate;

    b.  For witness fees and costs of suit incurred; and

    c.  For such other further relief as the Court deems just and proper.

**HURLBETT & FAUCHER**

DATE: April 16, 2009

          John D. Faucher, Attorney for Creditor William Hablinski Architecture